1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GEORGE-JASON A. HELM,

                                    Plaintiff,

        v.

MICHAEL HUGHES, JANET GAINES,
and SEAN MURPHY,

                                    Defendants.

No. C09-5381 RJB/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  January 28, 2011**

        Presently before the court is the Motion for Summary Judgment of Defendants Michael

Hughes, Karen Gaines, and Sean Murphy.  ECF No. 30.  Plaintiff filed a response.  ECF No. 31.

Defendants filed a reply.  ECF No. 32.  Plaintiff filed a surreply.  ECF No. 33.  On November 4,

2010, the court re-noted the motion for summary judgment and ordered Defendants to submit

supplemental briefing.  ECF No. 36.  On November 19, 2010, Defendants submitted

supplemental briefing.  ECF No. 38.  Plaintiff filed a response to Defendants' supplemental

briefing on December 14, 2010.  ECF No. 39.

        Having reviewed the motion, responses, supplemental briefing, and balance of the record,

the court recommends that the motion for summary judgment be granted.

## SUMMARY OF CASE[1]

        Mr. Helm sued Michael Hughes, Janet Gaines and Sean Murphy, claiming that they

subjected him to disciplinary punishment in retaliation for his good faith participation in the

---

[1] A detailed recitation of the facts is contained below.

REPORT AND RECOMMENDATION - 1

grievance program at the McNeil Island Corrections Center (MICC) in violation of the First and Fourteenth Amendments.[2]

Mr. Helm's claims arise from disciplinary sanctions he received after he filed a grievance against a corrections officer in September 2008.  After the corrections officer stopped and searched Mr. Helm, Mr. Helm complained in his grievance that the officer had been disrespectful and abused his discretionary authority.  He also stated, in part, that: "…his manner and demeanor is not conducive to rehabilitation.  This was abuse.  Abuse is violence, violence begets violence.  If I didn't have such self control like some, there would of [sic] been an incident."

Mr. Helm was infracted for violation of WAC 137-25-030(506), a Category B – Level 3 Serious Infraction (506 – Threatening another with bodily harm or with any offense against another person, property, or family.).  He was found guilty and sanctioned with 10-days cell confinement and 30 hours of extra duty.  The decision was upheld on appeal.

On February 16, 2010, the court granted Defendants' motion to dismiss (ECF No. 15) to the extent the complaint alleges that Mr. Helm's due process rights were violated during the disciplinary hearing.  *See* ECF Nos. 24 and 25.  Defendants' motion for summary judgment addresses Mr. Helm's remaining claim that Defendants retaliated against him after he filed the grievance.

**STANDARD OF REVIEW**

Summary judgment will be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its

---

[2] Mr. Helm is no longer incarcerated.  ECF No. 30, p. 15 (Legal Face Sheet reflects release from prison on December 3, 2009).

REPORT AND RECOMMENDATION - 2

motion, and of identifying those positions of the pleadings and discovery responses that

demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

   Where the moving party will have the burden of proof at trial, it must affirmatively

demonstrate that no reasonable trier of fact could find other than for the moving party.

*Calderone v. United States*, 788 F.2d 254, 259 (6th Cir. 1986).   On an issue where the non-

moving party will bear the burden of proof at trial, the moving party can prevail merely by

pointing out to the district court that there is an absence of evidence to support the non-moving

party's case. *Celotex*, 477 U.S. at 325.  If the moving party meets its initial burden, the opposing

party must then set forth specific facts showing that there is some genuine issue for trial in order

to defeat the motion. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S. Ct. 2502, 91 L.Ed.2d

202 (1986).   The party opposing the motion must do more than simply show that there is some

metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475

U.S. 574, 586 (1986).  "A plaintiff's belief that a defendant acted from an unlawful motive,

without evidence supporting that belief, is no more than speculation or unfounded accusation

about whether the defendant really did act from an unlawful motive." *Carmen v. San Francisco

Unified School Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).

## STATEMENT OF FACTS

   In September, 2008, Corrections Officer Benge stopped and searched Mr. Helm and

confiscated Mr. Helm's state hat because Officer Benge said that the hat had been altered.

According to Mr. Helm, Officer Benge was belligerent and intimidating.  ECF No. 13, p. 4.  Mr.

Helm immediately filed an offender complaint with MICC's grievance coordinator Michael

REPORT AND RECOMMENDATION - 3

1  Hughes, complaining that Officer Benge was disrespectful and abused his discretionary

2  authority.  Mr. Helm's grievance is as follows:

3   I want to grieve CO Benge.  He's disrespectful and obviously abuses his power.
   It was recall and he stopped me because he did not approve of my state issued hat
4   saying it was altered.  Had me stand for search, confiscated the hat, said he was
   going to do a room search.  I said are you serious dude in a very casual, non
5   threatening, low voice manner.  He flipped out demanding respect.  People go to
   jail for less.  His manner and demeanor is not conducive to rehabilitation.  This
6   was abuse.  Abuse is violence.  Violence begets violence.  If I didn't have such
   self control like some, there would of [sic] been an incident.  People of his nature
7   are detrimental to society, very confrontational and instigative.  I make no threats
   but reality is he should work on his people skills.  Others asked me what was
8   wrong and I explained without naming,
   FIRE HIM![3]
9   him, everyone said that must be Benge, so obviously he has a pattern of this
10  history.  I want action and don't say he was just doing his job.  This grievance is
   supposed to be meaningful.
11

12 ECF No. 31, Attach. A (ECF No. 31-1, p. 1).

13      According to Mr. Hughes, Mr. Helm's complaint about the officer would have been

14 assigned for investigation "under normal circumstances."  ECF No. 30-1, p. 21.  Mr. Helm's

15 grievance was not processed for investigation.  Instead, Mr. Hughes followed the Department of

16 Corrections' (DOC) Grievance Policy and Procedure Manual's instructions on handling

17 grievances that contain threats.  *Id.*, p. 2 and Attach. B (Grievance Policy and Procedures Manual

18 Threatening Complaints Procedure).

19      WAC 137-28-220 (202) prohibits abusive language, harassment or other offensive

20 behavior directed to or in the presence of staff, visitors, inmates, or other persons or groups.

21 WAC 137-25-030 (506) prohibits threatening another with bodily harm or with any offense

22 against another person.  According to Dan Pacholke, DOC Prison Administrator, these types of

23 restrictions are necessary, as prison inmates showing flagrant disrespect towards prison staff can

24

25

26 _____
[3] These words were inserted in the middle of the text of the grievance.

REPORT AND RECOMMENDATION - 4

decrease the safety and security of the prison and can make rehabilitation of prison inmates more difficult.  ECF No. 38-1.   DOC's Threatening Complaints Procedure provides that when a grievant submits "a complaint containing a <u>DIRECT</u> threat toward the life or safety of another person," the grievance coordinate shall initiate an infraction.  ECF No. 30-1, p. 26 [emphasis in original].

Mr. Hughes states that when he received Mr. Helm's September 28, 2010 grievance, he perceived the statement "…[t]his was abuse.  Abuse is violence, violence begets violence.  If I didn't have such control like some, there would of [sic] been an incident" as a threat of violence. ECF No. 30-1, p. 22.   Mr. Hughes sent the grievance and following email to Superintendent Van Boening:

> Please review this grievance and determine if it meets the criteria for threatening another.  The grievance manual advises that the Superintendent should pre-authorize threatening infractions on grievances, time permitting.  He writes that: "…abuse is violence, violence begets violence."

*Id.*, Exh. 2, Attach. C (ECF No. 30-1, pp. 29).

Superintendent Van Boening responded: "Yes it is a threat and his acknowledging that it is not a threat is a cover for what he knows is a threat."  ECF No. 30-1, p. 29.

Mr. Hughes then wrote a disciplinary infraction against Mr. Helm, stating that Mr. Helm violated WAC 137-25-030(506), a Category B – Level 3 Serious Infraction (506 – threatening another with bodily harm or with any offense against another person, property, or family), when Mr. Helm wrote "this was abuse.  Abuse is violence. Violence begets violence."  Mr. Hughes states that he did not initiate the infraction against Mr. Helm for complaining about a correctional officer.  *Id.*, p. 22.

REPORT AND RECOMMENDATION - 5

On October 17, 2008, MICC Hearings Officer Janet Gaines conducted Mr. Helm's disciplinary hearing and found him guilty of the 506 infraction (threatening another with bodily harm). ECF No. 30-1, p. 33. She based her decision on information contained in the infraction, Mr. Helm's testimony, and the definition of a threatening grievance contained in the Grievance Policy and Procedure's Manual. *Id.* Mr. Helm was sanctioned to confinement to quarters for 10 days and 30 hours of extra duty; he received no loss of good conduct time. ECF No. 30-1, p. 43. In finding Mr. Helm guilty, Ms. Gaines states that she was not retaliating against him for using the grievance system to complain about an officer. *Id.*

Mr. Helm appealed the guilty finding. ECF No. 30-1, pp. 46-47. Mr. Helm stated the following as his reason for appeal:

> I filed a grievance regarding what appears to be an abuse of discretionary authority. I have been targeted for failure by certain person official, having no other way to address my complaint. As a result of my good faith participation in the MICC grievance program, I was subjected to disciplinary action, accused of threatening. The mere use of the word violence does not indicate a threat. Neither does it indicate a direct threat against anyone. I ask that I not be punished for my good faith participation in the MICC grievance program, in retaliation with disciplinary punishment. I request the infraction against my good faith participation in the offender grievance program be dismissed.

ECF No. 30-1, pp. 47-48.

Prison Administrator Sean Murphy, the Superintendent's designee for reviewing disciplinary proceedings, upheld the guilty finding:

> I have reviewed your appeal and find that the sanctions are in accordance with WAC 506; Threatening another with bodily harm or with any offense against another person, property, or family. You have provided no new evidence or statements that would cause a change in the finding of guilt. I concur with the decision and sanction(s) of the Hearings Officer.

ECF No. 30-1, p. 48.

REPORT AND RECOMMENDATION - 6

Mr. Helm states that prior to the grievance at issue, he had written other grievances to Mr. Hughes that Mr. Hughes failed to take seriously.  ECF No. 31-2, p. 1.  Mr. Helm also states that he did not make any threat whatsoever in his grievance and that his words were taken out of context and manipulated to sound threatening.  *Id.*  Mr. Helm claims that he was explaining the incident and "cycle of violence" and that his grievance was the "only avenue to try to break the cycle of violence that [he] was subjected to."  *Id.*

## DISCUSSION

Mr. Helm generally contends that he was disciplined for "his good faith participation in the MICC grievance program," when he filed a grievance against Corrections Officer Benge.  ECF No. 13, p. 5.  There is no dispute that Mr. Helm has a right to utilize the grievance process and prison authorities may not retaliate against a prisoner for having utilized the grievance process.  *See, e.g., Hines v. Gomez*, 108 F.3d 265 (9th Cir. 1997).   However, as Mr. Helm acknowledges, he was not punished for filing the grievance; he was punished after prison officials concluded that the language contained in his grievance constituted a threat.  ECF No. 13, p. 4.[4]

The Ninth Circuit has previously held that disrespectful language in a prisoner's grievance is itself protected activity under the First Amendment.  *Bradley v. Hall,* 64 F.3d 1276,

---

[4] Mr. Helm argues that the issues raised in Defendants' motion should be barred by collateral estoppel and/or res judicata because this court previously held, in recommending denial of Defendants' motion to dismiss under Fed. R. Civ. P. 12(b) (6), that "for purposes of this motion, the court considers the plaintiff's statement that the language used in the grievance was not a threat.  With that assumption, again for purposes of this motion only, there can be no legitimate penological purpose for the infraction.  In a motion to dismiss, the court accepts Plaintiff's version of the facts and any reasonable inferences that can be drawn therefrom."  ECF No. 24, p. 8.  Rule 41(b) provides that any dismissal, except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19, operates as final judgment on the merits.  *See, e.g., Headwaters Inc. v. U.S. Forest Service*, 399 F.3d 1047, 1052 (9th Cir. 2005) (dismissal of an action with prejudice, or without leave to amend, is considered a final judgment on the merits).  This court did not recommend dismissal of Mr. Helm's claims, but denied Defendants' motion to dismiss because it found Mr. Helm had sufficiently alleged a retaliation claim.  That denial does not constitute a final judgment on the merits of Mr. Helm's retaliation claim.

REPORT AND RECOMMENDATION - 7

1281-82 (9th Cir. 1995), *abrogated on other grounds in Shaw v. Murphy,* 532 U.S. 223, 121 S.Ct. 1475, 149 L.Ed.420 (2001).  In *Bradley,* the Ninth Circuit held that "prison officials may not punish an inmate merely for using 'hostile, sexual, abusive or threatening' language in a written grievance."  The *Bradley* decision was subsequently criticized by the Supreme Court in *Shaw v. Murphy*, 532 U.S. 223, 230 n. 2, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001).  In *Shaw,* the Supreme Court disapproved of that portion of the Ninth Circuit's analysis in *Bradley* where it "balance[d] the importance of the prisoner's infringed right against the importance of the penological interest served by the rule," when it found that, as applied to the content of formal written grievances, the rule impermissibly "substantially burdened" prisoners' right of access to the courts.  *Shaw,* 532 U.S. at 230-31 *citing* 195 F.3d 1121, 1127 (C.A.9 1999) (quoting *Bradley v. Hall*, 64 F.3d 1276, 1280 (C.A.9 1995)).  The Supreme Court concluded that *Turner* does not permit increasing constitutional protection based *on the content* of the communication because *Turner* does not accommodate valuations of content.  532 U.S. at 230-31 (*citing Turner v. Safley,* 482 U.S. 78, 107 S. Ct. 2254, 96 L.Ed.2d 64 (1987) (emphasis added).   "On the contrary, the *Turner* factors concern only the relationship between the asserted penological interests and the prison regulation."  *Id.*, 532 U.S. at 230, 121 S.Ct. 1475.

Mr. Helm maintains that he was wrongly disciplined because the language contained in his grievance was not a direct threat.  *Shaw* instructs, however, that the court's focus must be content neutral.  Prison officials are to remain the primary arbiters of the problems that arise in prison management.  If courts were permitted to enhance constitutional protection based on their assessments of the content of the particular communications, courts would be in a position to assume a greater role in decisions affecting prison administration.  *Turner,* 482 U.S., at 89, 107 S. Ct. 2254 (quoing *Procunier v. Martinez,* 416 U.S. 396, 404, 94 S. Ct. 1800, 40 L.Ed.2d 224

REPORT AND RECOMMENDATION - 8

(1974).  Thus, this court will not second guess prison officials' determination that the language contained within Mr. Helm's grievance contained a threat.  The issues here are whether the prison regulation at issue is "reasonably related" to legitimate penological objectives and whether there is a genuine dispute that prison officials acted unreasonably in applying the prison regulation to Mr. Helm's written grievance.  *See Bahrampour v. Lampert,* 356 F.3d 969, 975 (9th Cir. 2004) (citing *Morrison v. Hall,* 261 F.3d 896, 905, 907 (9th Cir. 2001) (*Turner* analysis "applies equally to facial and 'as applied' challenges").  *See also, Hargis v. Beauchamp,* 312 F.3d 404 (9th Cir. 2002) (in conducting the as-applied analysis, we must determine whether there is a genuine dispute as to whether Hargis's statements in fact implicated legitimate safety concerns).

Mr. Helm argues that prison officials misinterpreted and manipulated his words.  However, unlike in *Hargis*, where the communication was oral, there is no dispute here as to what Mr. Helm wrote.  As the foregoing cases make clear, it is also not up to this court to inquire whether what he wrote was in fact within the ambit of the governing DOC policy and whether the prison officials applied their own policy.  As the Ninth Circuit explains in *Hargis* and *Bahrampour*, the proper question is whether in the particular circumstances of Mr. Helm's case, prison officials had legitimate reasons to apply the governing regulation, independent of whether the regulation was ultimately deemed violated.  *See, e.g., Shaw,* 121 S.Ct. at 1481 ("[T]he question remains whether the prison regulations, *as applied* to Murphy, are 'reasonably related to legitimate penological interests.'") (emphasis added).  To prevail, Mr. Helm must overcome the presumption that the prison officials acted within their "broad discretion."  *Shaw*, 532 U.S. at 232 (*citing Abbott,* 490 U.S. at 413).

REPORT AND RECOMMENDATION - 9

**A.**   ***Turner* Factors**

The Supreme Court has identified four factors to consider when determining the reasonableness of a prison rule:  1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; 2) "whether there are alternative means of exercising the right that remain open to prison inmates"; 3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and, 4) the "absence of ready alternatives" or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." *Turner v. Safley,* 482 U.S. 78, 89-90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *see also Shakur v. Schriro,* 514 F.3d 878, 884 (9th Cir. 2008) (noting *Turner* factors).

*1)     Legitimate Governmental Interest*

One of the primary goals of the prison system is to promote a safe and secure environment within the prisons for staff, inmates, and community members.  ECF No. 38-1, p. 3, ¶ 5.  *See, Bell v. Wolfish*, 441 U.S. 520, 546, 99 S. Ct. 1861, 1878, 60 L. Ed. 2d 447 (1979) ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of . . . convicted prisoners . . . ."  The establishment and enforcement of rules requiring respect for authority enhances security within the prison.  *Ustrak v. Fairman,* 781 F.2d 573, 580 (7th Cir. 1986).

Dan Pacholke, the Prison Administrator of the DOC, states that allowing inmates in a prison setting to threaten staff, either verbally or in writing, threatens the safety and security of the prison.  Prison staff need to maintain order and cannot do so if inmates are allowed to threaten them.  If inmates were allowed to submit written threats, this could intimidate staff and

REPORT AND RECOMMENDATION - 10

interfere with their ability to adequately perform their jobs.  Prison staff is often required to work one on one with inmates and if unable to do so because they are in fear of the inmate, other staff may need to be pulled from other areas or the staff may not be able to provide a needed service.  Inmates may also use written threats to intimidate staff into not enforcing prison rules which could lead to grave safety concerns for staff and inmates alike.  *Id.*, ¶ 6.

Prison rehabilitation is also a goal of the state prison system.  *Id.*, ¶ 7.  Behavior management is just one of the tools DOC uses in addressing inmate rehabilitation/recidivism.  As part of behavior management, one of the lessons stressed is the need for self control.  Many of the rules in prison are about an offender exerting self control thereby controlling behavior.  *Id.*  It is believed that through living in a prison system where rules that promote self control are enforced, offenders are better prepared to live life outside prison walls.  *Id.*  Mr. Pacholke states that DOC's attempts to teach inmates self-control will be undermined by allowing prison inmates to submit written threats.  Prison policies that require inmates to treat prison staff and other inmates with respect could be circumvented and inmates would not be held accountable for their inappropriate actions.  *Id.*, ¶ 8.

Defendants argue that insolent, abusive or scurrilous language in a prison setting does not become "safe" merely because it is in written form rather than spoken aloud.  Instead, language contained in a written grievance may actually create more of a disturbance in the prison than mere spoken words.  Inmates may deliberately choose to use the written form of grievances because they know the grievance will be read by more than one staff person and the language will be spread throughout the institution.  As noted above, prisoners wanting to get messages to multiple areas of the prison are likely to submit written grievances, as it is the best way to ensure that information is disseminated throughout the facility.  ECF No. 38-1, p. 3, ¶ 3.  If the intent of

REPORT AND RECOMMENDATION - 11

the inmate is to threaten, embarrass or harass the targeted staff person, that intent is more likely to succeed in the form of a written grievance that will be read by the staff person's peers or supervisors than if spoken aloud directly to the staff person.  The language is a direct communication from the prison inmate to prison staff, submitted with the intention of having prison staff read it.  Moreover, prison grievances often trigger an internal investigation into the allegations contained in the complaint.  *See* ECF No. 38-1, p. 6 (Exh. A, Attach. 1, DOC Policy 550.100, Offender Grievance Program).   Thus, even an informal investigation into a prison grievance would spread the objectionable language further within the prison than language used in a person-to-person exchange.

Defendants argue that, unlike *outgoing* personal correspondence containing inflammatory language that "cannot reasonably be expected to present danger to the community *inside* the prison", prison grievances are designed to be read, responded to, and acted upon *inside* the prison by prison staff.  Thus, inflammatory language intended for reading and dispersal within the prison can indeed "reasonably be expected to present danger to the community inside the prison".  ECF No. 38, pp. 3-4 (*citing  Thornburgh v. Abbott*, 490 U.S. 401, 411-12, 109 S. Ct. 1874, 1880-81 (1989) (emphasis in original)).

Mr. Helm contends that a "negative non-rehabilitative environment" is created when prison guards are permitted to abuse a prisoner and then ignore a prisoner's grievance "articulating how the C/O acted, how it made him feel and what such negative contacts can lead to."  ECF No. 39, p. 2.   He does not dispute, however, that the twin purposes of prison safety and prisoner rehabilitation are valid, rational, and legitimate.  He also does not dispute that there is a valid connection between DOC's regulation and these legitimate purposes.

REPORT AND RECOMMENDATION - 12

Thus, whether written or spoken, there is clearly a rational connection between the regulation of prohibiting inmates from threatening and coercing persons and the legitimate interest of maintaining order in institutions.  *See, e.g., In re Parmelee*, 115 Wn. App. 273, 285, 63 P.3d 800 (2003) (rules intended to promote respect for correctional officers help prison staff display the high degree of self-control necessary in the correctional profession by heading off situations in which inmates may bait or goad guards into unprofessional conduct); *see also Hargis*, 312 F.3d at 410 (prison authorities have a legitimate penological interest in the consistent enforcement of prison rules and that disciplining prisoners who attempt to coerce a guard into not enforcing prison rules is reasonably related to that interest).[5]

2.   *Alternative Means Available to Prison Inmates*

DOC Grievance Policy 550.100 sets forth the procedure for handling grievances.  When inmates enter the custody of the DOC, they are provided with an Offender Grievance Program Manual.  ECF No. 38-1, p. 3, ¶ 4; Attach. 2.  The manual instructs offenders about the grievance process and includes instructions on how to write a proper grievance.  *Id.*, p. 3, ¶ 4, Attach. 2, pp. 26-28 and 31-21 (ECF Numbering).  Offenders are also told that the grievance coordinator shall

---

[5]  Several federal courts have also recognized that prison safety, security, discipline and order are legitimate penological interests that are served by restricting the written language of inmates.  *See e.g., Hale v. Scott*, 371 F.3d 917, 919 (7th Cir. 2004) (groundless allegations in a legal pleading can be sanctioned without anyone supposing that First Amendment issues are raised); *Hadden v. Howard*, 713 F.2d 1003, 1005 (3rd Cir. 1983) (malicious lies and disrespect toward prison staff members in an inmate complaint may reasonably be expected to raise serious problems of staff morale and prison discipline); *Gibbs v. King*, 779 F.2d 1040, 1045 (5th Cir. 1986) (disciplinary regulation prohibiting prisoners from making or writing derogatory or degrading remarks about prison employees furthered legitimate interests, as the clear purpose of the rule was "to prevent escalation of tension that can arise from gratuitous exchanges between inmates and guards and to enable employees to maintain order without suffering . . . challenges to their authority"); *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (prisoner has no right to file grievances "in a manner that violates legitimate prison regulations or penological objectives");  *Leonard v. Nix*, 55 F.3d 370, 374-76 (8th Cir. 1995) (disciplinary sanction for a prison inmate who wrote vulgar, obscene, and racist comments against prison staff in letters he was sending to a former inmate was proper even though "diatribe" was in writing as "[t]here is little doubt that the same language, if spoken by [the plaintiff] directly to the warden, would result in justifiable disciplinary action to preserve discipline and order").

REPORT AND RECOMMENDATION - 13

1   refer any grievance that contains a direct threat to the life or safety of a person to the disciplinary

2   process for review. *Id.*, p. 3, ¶ 4; Attach. 2, p. 43.

3       Mr. Helm contends that filing a grievance was his only avenue to prevent further abuse.

4   ECF No. 39, ¶ 4.   There is no evidence that Mr. Helm was prohibited from filing grievances and

5   he acknowledges that he was disciplined because of the content of his grievance.   Thus, the

6   regulation constrained Mr. Helm only as to the nature of the language he chose to include in his

7   grievances.   He was free to file a grievance that did not refer to the violence that "might have"

8   occurred.   Limiting his First Amendment rights because the institutional goals of promoting

9
10   respect, safety and rehabilitation take precedent is not unconstitutional. *See,eg., Wolff v.*

11   *McDonnell,* 418 U.S. 539, 555-56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

12       *3.      Impact on Prison Staff, Inmates and Allocation of Resources*

13       Under this factor, the court must consider the impact of allowing prisoners to use abusive

14   or threatening language in written grievances.   Defendants are not aware of any alternatives to

15
16   prohibiting inmates from submitting written threatening or abusive language in grievances other

17   than to allow it.   ECF No. 38-1, p. 4, ¶ 9.   On the other hand, allowing offenders to submit

18   written threats or otherwise inappropriate language, thereby circumventing prison rules, directly

19   contradicts DOC's goal of rehabilitation and puts prison staff and inmates' safety and security at

20   risk. *Id.   See also, Ustrak v. Fairman,* 781 F.2d 573, 580 (7th Cir. 1986) (There are "few things

21   more inimical to prison discipline than allowing prisoners to abuse guards and each other. The

22
23   level of violence in American prisons makes it imperative that the authorities take effective steps

24   to prevent provocation.")  *Id.* at 580.

25       As noted above, abusive or threatening language does not become safe merely because it

26   is written but may actually create more of a disturbance because inmates may use the written

REPORT AND RECOMMENDATION - 14

form to disseminate the abuse or threat among prison officials.  ECF No. 38-1, p. 3, ¶ 3. Limiting

prison officials from sanctioning abusive or threatening behavior, whether spoken or written,

would undermine the undisputed legitimate penological purposes served by the regulation at

issue.

        *4.*     *Absence of Ready Alternatives*

       As noted above, there are no alternatives to prohibiting abusive or threatening language

in a grievance other than allowing prisoners to include the abusive or threatening language in

their grievances.  Shielding prison officials who are in direct contact with prison inmates from

the content of inmate grievances is not a ready alternative as such shielding will not resolve the

problems created by the use of inappropriate language and the penological goals of rehabilitation

and self-control will remain unmet.  On the other hand, prisoners can utilize the grievance

system without including abusive or threatening language in their grievances.

**B.**    **As-Applied Analysis**

       The foregoing *Turner* analysis leads to the conclusion that there is a valid, rational

connection between the regulation and legitimate government interests.  Mr. Helm provides no

evidence to the contrary.  The court looks now to the question of whether application of WAC

137-35-030(506) to Mr. Helm's grievance was reasonable.

       Mr. Helm argues that he did not intend his words to be viewed as a threat.  However, it is

not up to this court (or a jury) to guess what Mr. Helm might have been thinking when he wrote

his grievance.  Even if the court accepted that Mr. Helm did not intend a threat, it is not this

court's role to suggest to prison officials that an alternative interpretation may exist.  In *Bell v.*

*Wolfish*, the Supreme Court emphasized that "courts should defer to the informed discretion of

prison administrators because the realities of running a corrections institution are complex and

REPORT AND RECOMMENDATION - 15

1    difficult, courts are ill-equipped to deal with these problems, and the management of these

2    facilities is confided to the Executive and Legislative Branches, not to the Judicial Branch."  441

3    U.S. at 547 n. 29, 99 S.Ct. at 1878 n. 29 (citations omitted).

4            Unlike the inmate in *Hargis,* there is no issue of material fact here as to what Mr. Helm

5    said.  He wrote what he wrote.  Whether he intended to threaten Correctional Officer Benge is

6    not material to this analysis.  What is material is that there exists a regulation to prohibit

7    threatening language, the regulation is constitutional because it has legitimate penological

8    purposes, and prison officials reasonably determined that the regulation should be applied to the

9    words contained in Mr. Helm's grievance.  Grievance Specialist Hughes believed that the

10   language constituted a threat.  He sent the grievance on to Superintendant Van Boening, who

11   agreed that the words represented a threat.  Mr. Hughes then instituted the infraction process and

12   the infraction was upheld in a disciplinary hearing by Hearings Officer Janet Gaines and

13   Superintendent Designee Sean Murphy.   The court concludes that they did not act unreasonably

14   in applying the regulation to Mr. Helm's written grievance.

15

16

17   **C.    Retaliation**

18          A plaintiff can establish that his First Amendment rights have been adversely affected by

19   retaliatory conduct only when the plaintiff shows: (1) that the plaintiff was engaged in a

20   constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to

21   suffer an injury that would likely chill a person of ordinary firmness from continuing to engage

22   in that activity; and (3) that the adverse action was motivated at least in part as a response to the

23   exercise of plaintiff's constitutional rights.  *Mendocino Environmental Center v. Mendocino*

24   *County*, 192 F.3d 1283, 1300-01 (9th Cir. 1999).   Challenges to institutional restrictions that are

25

26

REPORT AND RECOMMENDATION - 16

asserted to inhibit First Amendment interests must also be analyzed in terms of the legitimate policies and goals of the corrections system.  *Pell v. Procunier*, 417 U.S. 817 (1974)

Essentially Mr. Helm argues that he submitted a grievance, he has a constitutional right to submit a grievance, he was infracted and disciplined in retaliation for filing the grievance. However, the evidence reflects and Mr. Helm acknowledges that he was not being punished or sanctioned for using the grievance process, but for the language he chose to use in exercising his right to file the grievance.  The evidence also reflects that Mr. Helm was aware of the prison regulation prohibiting the inclusion of threatening language in a written grievance.  Finally, application of the *Turner* factors reveals that the regulation is constitutional.  Thus, Mr. Helm has failed to show that he was engaged in the exercise of a constitutional right when he submitted a grievance containing the language:   "…This was abuse, abuse is violence, violence begets violence.  If I didn't have such control like some, there would of [sic] been an incident."

The grievance specialist and superintendent believed the language contained in Mr. Helm's grievance constituted a threat.  The disciplinary officer agreed that the words represented a threat and her decision was upheld on appeal by the superintendent's designee.  Mr. Helm presents no evidence of retaliatory motive for any of these actions.  Nor does he show that the actions of the prison officials were not reasonably related to the undisputed legitimate penological interests of promoting safety, security, and maintaining institutional order.

Accordingly, the undersigned recommends that Defendants' motion for summary judgment on Mr. Helm's claim of retaliation be granted.

**D.    Qualified Immunity**

Defendants contend that they are entitled to qualified immunity.  "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533

REPORT AND RECOMMENDATION - 17

1   U.S. 194, 200, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S.

2   511, 526, 105 S. Ct. 2806, 86 L.Ed.2d 411 (1985)).   The court evaluates a defendant's qualified

3   immunity defense using a two-step inquiry.  *Id*.  However, the Supreme Court recently held that

4   this two-step inquiry is no longer an inflexible requirement.  *Pearson v. Callahan*, 555 U.S. 223,

5   129 S. Ct. 808, 818, 172 L.Ed.2d 565 (2009) (explaining "that, while the sequence set forth [in

6   *Saucier*] is often appropriate, it should no longer be regarded as mandatory").  It is within our

7   "sound discretion in deciding which of the two prongs of the qualified immunity analysis should

8   be addressed first in light of the circumstances in the particular case at hand."  *Id*.

9

10         Under *Saucier's* first prong, the court must determine whether, viewing the facts in the

11   light most favorable to the plaintiff, the government employees violated the plaintiff's

12   constitutional rights.  *Saucier*, 533 U.S. at 201, 121 S. Ct. 2151.  If the court determines that a

13   constitutional violation has occurred, under *Saucier's* second prong, it must determine whether

14   the rights were clearly established at the time of the violation.  *Id*.  For a right to be clearly

15   established, its contours "must be sufficiently clear that a reasonable official would understand

16   that what he is doing violates the right."  *Id*. at 202, 121 S. Ct. 2151 (quoting *Anderson v.*

17   *Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987)).  The protection afforded

18   by qualified immunity "safeguards 'all but the plainly incompetent or those who knowingly

19   violate the law.'"  *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist*., 149 F.3d 971, 977

20   (9th Cir.1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L.Ed.2d 271

21   (1986)).

22

23         It is not necessary to address Defendants' arguments that qualified immunity should be

24   applied to Mr. Helm's claims because the undersigned has concluded that Defendants did not

25   violate Mr. Helm's constitutional rights.

26

REPORT AND RECOMMENDATION - 18

**CONCLUSION**

For the reasons stated above, the undersigned recommends that Defendants' motion for summary judgment (ECF No. 30) be **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **January 28, 2011,** as noted in the caption.

DATED this 6th day of January, 2011.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 19